[Cite as *In re M.T.*, 2020-Ohio-5493.]

STATE OF OHIO )
)ss:
COUNTY OF SUMMIT )

IN THE COURT OF APPEALS
NINTH JUDICIAL DISTRICT

IN RE: M.T.

C.A. No.     29690

APPEAL FROM JUDGMENT
ENTERED IN THE
COURT OF COMMON PLEAS
COUNTY OF SUMMIT, OHIO
CASE No.     DN 17 02 0140

DECISION AND JOURNAL ENTRY

Dated: December 2, 2020

PER CURIAM.

{¶1} Appellant Mother appeals the judgment of the Summit County Court of Common Pleas, Juvenile Division, that awarded legal custody of her child M.T. to the child's paternal grandparents ("Grandmother", "Grandfather", collectively "Grandparents"). This Court reverses and remands for further proceedings.

I.

{¶2} Mother and Father are the biological parents of M.T. (d.o.b. 12/24/16). They were never married and ended their romantic relationship during the case below, although they maintained a close platonic relationship. Grandmother and Grandfather are the paternal grandparents of the child.

{¶3} M.T. was born prematurely and at the parents' home, as Mother did not realize that she was pregnant. Immediately after his birth, the infant suffered two rib fractures due to

resuscitative efforts by paramedics. When the child was mature enough to be released from the hospital, he went home with his parents.

{¶4} When Mother took the child for a well-baby check a few weeks later, the doctor referred him for additional care based on the child's weight loss. At that point, medical providers determined that the child had suffered multiple additional fractures to his ribs, clavicle, and femur. The injuries were diagnosed as nonaccidental trauma, and the hospital made a referral to Summit County Children Services Board ("CSB" or "the agency").

{¶5} Based on the nature of the child's injuries, CSB filed a complaint alleging that M.T. was an abused, neglected, and dependent child. The agency sought, and received with agreement of Mother and Father, an emergency order of temporary custody of the child to Grandparents under the protective supervision of CSB. Mother and Father later waived their rights to an adjudicatory hearing and stipulated that M.T. was an abused, neglected, and dependent child.[1]

{¶6} After a dispositional hearing, the child was placed in the temporary custody of Grandparents, under an order of protective supervision by CSB. Mother and Father were to have supervised visitation as agreed by the parents and Grandparents. The juvenile court adopted the agency's case plan as the order of the court. The case plan goal was reunification with Mother and Father and included the following objectives: (1) Mother and Father shall engage in an intensive parenting class and demonstrate what they have learned through healthy interactions with the child; (2) Mother, Father, or the designated caregiver shall meet all of the child's basic needs, ensure that M.T. receives timely medical care and participates in Help Me Grow services, and shall follow all

---

[1] CSB dismissed one allegation of abuse pursuant to R.C. 2151.031(C), and one allegation of neglect pursuant to R.C. 2151.03(A)(6). M.T. was adjudicated abused pursuant to R.C. 2151.031(B) and (D), neglected pursuant to R.C. 2151.03(A)(2) and (3), and dependent pursuant to R.C. 2151.04(C).

recommendations of the professionals associated with the child; (3) Mother and Father shall obtain a diagnostic assessment, follow all recommendations, and demonstrate emotional and behavioral stability; and (4) Father shall obtain a chemical dependency assessment, follow all recommendations, and submit random urine drug screens.

{¶7} The first semi-annual review filed by CSB indicated that the parents had made "some" and "significant" progress on case plan objectives. In particular, Father had completed his drug and alcohol assessment which indicated no concerns or chemical dependency diagnosis. All of Father's drug screens were negative. In addition, the review noted that the Akron Police Department had closed its investigation because there was not enough evidence to charge anyone with the child's abuse. The identity of the perpetrator remained unknown.

{¶8} Prior to the one-year sunset date, Mother filed a motion for a six-month extension of temporary custody, while CSB filed a motion for legal custody to Grandparents. After a hearing, the magistrate denied CSB's motion and granted Mother's motion for a six-month extension. The magistrate found that both parents had made significant progress on their case plan objectives and that the relationship between the parents and Grandparents was "conflictual and tense." Given the parents' significant case plan compliance, along with the admission by the guardian ad litem that reunification of the child with his parents was "possibly" likely within six months, the magistrate extended the period of temporary custody.

{¶9} Thereafter, CSB moved to modify visitation based on the parents' case plan compliance to allow unsupervised visits on a schedule to be agreed by the parents and custodians. Mother moved for legal custody. Grandparents also moved for legal custody. More than a month later, CSB filed a motion for legal custody to Grandparents and withdrew its prior motion for unsupervised visitation. In support, the agency, while admitting that the parents had substantially

complied with their case plan objectives, expressed ongoing concerns for the child's safety because neither Mother, Father, nor any other person living in the household at the time of the abuse had admitted responsibility for M.T.'s injuries.

{¶10} At a hearing, the guardian ad litem recommended a second six-month extension of temporary custody based on the parents' substantial additional progress on their case plan objectives. The magistrate ordered the extension. In addition, as the parties further requested the opportunity to mediate the matter, the magistrate scheduled a date for mediation. Mediation was ultimately unsuccessful.

{¶11} Thereafter, the magistrate held a hearing on the three pending dispositional motions: Mother's motion for legal custody, Grandparents' motion for legal custody, and CSB's motion for legal custody to Grandparents. After two days of hearings, during which both Grandparents and CSB rested their cases and Mother presented a portion of her case-in-chief, the magistrate expressed significant concerns regarding her ability to render an informed decision given that (1) Mother and Father had never been allowed to have unsupervised visitation with the child; (2) Grandfather had admitted that from the beginning he had intended to "take legal custody of the Child[,]" and (3) the evidence indicated Grandfather's unwillingness to facilitate Mother's and Father's visitation with the child as ordered based on Grandfather's belief that his schedule took precedence over the parents' visits with M.T. Accordingly, the magistrate continued the hearing for a couple months and ordered that Mother and Father would have unsupervised visitation from 8:00 a.m. until 7:30 p.m. at least two days a week. The caseworker and guardian ad litem were to conduct at least one announced and one unannounced visit each month.

{¶12} At the next hearing date, the magistrate again continued the matter based on the absence of Father's attorney, the absence of the caseworker who was ill, and the lack of an updated

report by the guardian ad litem. After the hearing was concluded two months later, the magistrate found that an award of legal custody to Mother was in the child's best interest based on the established parent-child bond, the fact that Mother's physical and mental health was better than Grandparents', and the belief that Grandparents would not facilitate visitation between the parents and child. Father was awarded visitation, and the magistrate expressed the hope that the parents would allow Grandparents to visit with the child. The juvenile court adopted the magistrate's decision the same day.

{¶13} Grandparents filed timely objections, and Mother responded in opposition. Emphasizing that Grandparents had provided for the child's needs throughout nearly his entire life, the juvenile court sustained the objections, granted legal custody to Grandparents, terminated CSB's protective supervision, and awarded unsupervised visitation to Mother and Father as the parents and custodians might agree. In the absence of agreement, the court's standard order of visitation would apply. In addition, Grandparents were ordered to inform the parents regarding the child's appointments, education, and other matters without requiring prior inquiry by Mother and Father. Mother appealed and raises one assignment of error for review.

II.

**ASSIGNMENT OF ERROR**

THE TRIAL JUDGE ABUSED HER DISCRETION BY OVERRULING THE MAGISTRATE'S DECISION OF LEGAL CUSTODY TO [MOTHER] ON OBJECTION. THE JUDGE'S DECISION IS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE.

{¶14} Mother argues that the juvenile court's award of legal custody to Grandparents was against the manifest weight of the evidence.

{¶15} For the reasons set forth in the separate opinions, the judgment of the juvenile court is reversed and the cause remanded for further proceedings.

III.

{¶16} Mother's sole assignment of error is sustained. The judgment of the Summit County Court of Common Pleas, Juvenile Division, is reversed and the cause remanded for further proceedings consistent with this opinion.

Judgment reversed,
and caused remanded.

There were reasonable grounds for this appeal.

We order that a special mandate issue out of this Court, directing the Court of Common Pleas, County of Summit, State of Ohio, to carry this judgment into execution. A certified copy of this journal entry shall constitute the mandate, pursuant to App.R. 27.

Immediately upon the filing hereof, this document shall constitute the journal entry of judgment, and it shall be file stamped by the Clerk of the Court of Appeals at which time the period for review shall begin to run. App.R. 22(C). The Clerk of the Court of Appeals is instructed to mail a notice of entry of this judgment to the parties and to make a notation of the mailing in the docket, pursuant to App.R. 30.

Costs taxed equally to Appellees.

LYNNE S. CALLAHAN
FOR THE COURT

CALLAHAN, P.J., CONCURRING IN JUDGMENT ONLY.

{¶17} Although I agree with the other concurring opinion that supports reversal of the juvenile court's judgment, I cannot join in that opinion because I would reach that conclusion for different reasons. Moreover, I disagree with the analysis and disposition of the appeal as proposed by the dissent.

{¶18} While the appellate court generally reviews a trial court's action regarding a magistrate's decision for an abuse of discretion, this Court must do so within the context of the nature of the underlying matter. *In re J.B.*, 9th Dist. Lorain No. 18CA011424, 2019-Ohio-1929, ¶ 7, citing *In re I.R.*, 9th Dist. Summit No. 27775, 2016-Ohio-2919, ¶ 8. With that in mind, this Court recognizes:

> On appeal, an award of legal custody will not be reversed if the judgment is supported by a preponderance of the evidence. Preponderance of the evidence entails the greater weight of the evidence, evidence that is more probable, persuasive, and possesses greater probative value. In other words, when the best interest of the child is established by the greater weight of the evidence, the trial court does not have discretion to enter a judgment that is adverse to that interest. Thus, our standard of review is whether a legal custody decision is against the manifest weight of the evidence.

(Internal citations and quotations omitted.) *In re M.F.*, 9th Dist. Lorain No. 15CA010823, 2016-Ohio-2685, ¶ 7.

{¶19} In considering whether the juvenile court's judgment is against the manifest weight of the evidence, this Court "weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the [finder of fact] clearly lost its way and created such a manifest miscarriage of justice that the [judgment] must be reversed and a new [hearing] ordered." (Internal quotations omitted.) *Eastley v. Volkman*, 132 Ohio St.3d 328, 2012-Ohio-2179, ¶ 20.

{¶20} "Following an adjudication of neglect, dependency, or abuse, the juvenile court's determination of whether to place a child in the legal custody of a parent or a relative is based solely on the best interest of the child." *In re K.H.*, 9th Dist. Summit No. 27952, 2016-Ohio-1330, ¶ 12. The statutory scheme regarding an award of legal custody does not include a specific test or set of criteria, but Ohio courts agree that the juvenile court must base its decision to award legal custody on the best interest of the child. *In re B.B.*, 9th Dist. Lorain No. 15CA010880, 2016-Ohio-7994, ¶ 18, quoting *In re N.P.*, 9th Dist. Summit No. 21707, 2004-Ohio-110, ¶ 23. In that regard, the juvenile court is guided by the best interest factors enunciated in R.C. 2151.414(D) relating to permanent custody. *In re B.G.*, 9th Dist. Summit No. 24187, 2008-Ohio-5003, ¶ 9, citing *In re T.A.*, 9th Dist. Summit No. 22954, 2006-Ohio-4468, ¶ 17. Those factors include the interaction and interrelationships of the child, the child's wishes, the custodial history of the child, the child's need for permanence, and whether any of the factors in R.C. 2151.414(E)(7)-(11) are applicable. R.C. 2151.414(D)(1)(a)-(e); *see also In re B.C.*, 9th Dist. Summit Nos. 26976, 26977, 2014-Ohio-2748, ¶ 16. In addition, the juvenile court may also look to the best interest factors in R.C. 3109.04(F)(1) for guidance. *In re K.A.*, 9th Dist. Lorain Nos. 15CA010850, 15CA010860, 2017-Ohio-1, ¶ 17. While some factors overlap with those above, others include the child's adjustment to his or her environment; the mental and physical health of all persons involved; the parents' history of providing support and honoring companionship orders; whether a parent plans to or has established a residence outside of Ohio; and certain indicia of violence, abuse, or neglect in any household involved. R.C. 3109.04(F)(1). Such indicia include convictions relating to the abuse or neglect of a child, as well as whether there exists any "reason to believe that either parent has acted in a manner resulting in a child being an abused or a neglected child[.]" R.C. 3109.04(F)(1)(h).

{¶21} At the commencement of the legal custody hearing, M.T. was approximately 26 months old. The child has some special needs and developmental delays, which the child's early intervention specialist testified were possibly based on a combination of his premature birth, lack of prenatal care as Mother did not realize that she was pregnant, and the injuries he sustained as an infant. M.T. wears glasses, takes medication for slow gastric emptying, and suffers delays in gross motor development, as well as in both expressive and receptive language. He receives services from Help Me Grow and Stark County Board of Developmental Disabilities ("Stark DD"). Included in those services are speech and physical therapies. At the time of the hearing, M.T. was unable to express himself verbally. He had begun to use some limited sign language and gestures to communicate his needs and feelings. His early intervention specialist at Stark DD testified that the child's needs are not extreme and that different caregivers would be able to learn how to meet those needs over time. Mother verified that the child's developmental services could be transferred to Summit County Board of Developmental Disabilities if she regained legal custody.

{¶22} M.T. was in unmarried Mother's legal custody for the first two months of his life, at which time he was removed by CSB. Because of time spent in the hospital, the child spent only approximately three weeks in the physical custody of his parents. Thereafter, M.T. has lived for over two years with Grandparents and their two teenaged children. He is bonded with all four family members in that home. Grandparents have consistently provided for M.T.'s medical and therapeutic needs. They have not, however, prioritized the child's emotional needs, as evidenced in particular by Grandfather's ongoing rancor towards the parents, as well as Grandfather's limitations on Mother's and Father's ability to visit with the child or attend appointments relevant to the child.

{¶23} Mother and Father had supervised visitation in Grandparents' home as the temporary custodians allowed. Only when the magistrate continued the legal custody hearing for the express purpose of granting the parents unsupervised visitation did Mother and Father finally have the opportunity to spend time with M.T. outside of the hovering supervision of Grandparents. For four months, Mother and Father enjoyed full days and overnights with the child in their shared home.

{¶24} From the initiation of this case, the relationship between the parents and Grandparents has been a stressful and contentious one. For the first couple months, Grandmother maintained contact with Mother and Father and provided them with clear information regarding the child's appointments. Mother and Father attended those appointments unless they were at work. For unknown reasons, Grandmother stopped providing the parents with information. Grandfather admitted that he did not inform Mother and Father of any in-home or out-of-home appointments or services regarding M.T. unless they explicitly asked. For example, neither parent received information regarding the child's in-home developmental services provided by Help Me Grow for over a year. The child's early intervention specialist testified that only Grandparents and the CSB caseworker were present for the child's initial assessment and that she was never provided with any contact information for Mother or Father. The service coordinator always scheduled subsequent sessions with Grandparents, and never contacted the parents.

{¶25} As Grandmother worked during the day and Grandfather was retired, Grandfather was the primary caregiver for M.T. Mother and Father were required to coordinate their visits with the child through Grandfather via text messages. Grandparents were aware that Mother's work schedule varied and that she received her schedule at the beginning of each week. Accordingly, Mother texted Grandfather early each week with her availability for visits.

{¶26} Mother submitted into evidence copies of text messages showing that Grandfather would routinely take a day or more to respond to Mother's visitation requests. When he did respond, he habitually approved fewer of the opportunities to visit than Mother requested without explanation. Although the CSB caseworker directed Mother to increase the number of her weekly visits with M.T. and to include a full day visit with the child, Grandfather never approved the total number of visits Mother requested in any week. In addition, he rejected Mother's first request for an all-day visit. On the other hand, Mother neither inquired as to why some of her visitation requests were rejected nor proposed alternate dates or times for visitation. In some cases, Grandfather testified that the parents' visitation requests conflicted with family activities involving Grandparents' household. Neither Grandparents nor Mother and Father proposed including the parents in any of those activities.

{¶27} Grandparents scheduled the in-home service appointments to accommodate their schedules, as well as the child's waking schedule. Once Mother was finally informed regarding the in-home sessions, she attended three. When she missed the next appointment for an unknown reason, Grandparents again scheduled the sessions at a time when Mother would be unavailable due to her work schedule.

{¶28} Mother was diagnosed with situational depression. Near the end of the case when her stress level was high, she requested fewer visits to be able to engage in self-care. On one occasion, Mother admitted to staying in bed all day. Mother, however, was fully compliant with her counseling requirements and otherwise making good progress. Although the caseworker and guardian ad litem acknowledged Mother's progress, both expressed concerns that Mother was not assertive with Grandfather when scheduling visitation. Mother explained that she had earlier faced

retribution when she was more assertive. Once, Grandfather threatened to terminate Mother's visitation when she arrived unannounced with Father during one of his visits.

{¶29} Grandfather clearly expressed to the parents that he was in control of their access to the child. In fact, Father testified that Grandfather referred to himself as "God" regarding his ability to control the interactions between the parents and M.T. The caseworker confirmed that the parents were required to coordinate visitation with the temporary custodians, rather than with the agency. There were many examples of times when Mother and Father were unable to see the child because Grandparents' schedule took precedence. Moreover, although the maternal grandmother and a paternal cousin had been approved to supervise visits, Grandfather never permitted such visits to occur.

{¶30} As to permanency planning for the child, CSB's case plan goal throughout the case was reunification with the parents. There is no dispute that Mother and Father completed their objectives by obtaining all assessments, following through with counseling, completing parenting classes, demonstrating the ability to meet their own and the child's basic and special needs, and demonstrating healthy and safe interactions with the child. Neither the caseworker nor the guardian ad litem had any concerns regarding Mother's or Father's parenting abilities. In addition, neither grandparent observed any concerns or risk to M.T. during either parent's visitation with the child.

{¶31} Nevertheless, there is no dispute that M.T. suffered abuse at the hands of someone close to him during the three weeks he lived in a home with Mother, Father, the maternal grandmother, and a maternal aunt. Beyond the two rib fractures sustained during resuscitative efforts at birth, the child suffered 13 additional rib fractures, as well as a broken clavicle and femur. Mother and Father stipulated to the allegations in the complaint, including the allegation that the

child's injuries were in different stages of healing. The reasonable inference is that M.T. was abused on multiple occasions. Both parents denied having caused the child's injuries, while neither could articulate any reasonable explanation for them. For example, Mother opined that the child's car seat harness was too tight when she drove over a rough roadway. The caseworker and guardian ad litem remained concerned throughout the case that the identity of the perpetrator and the circumstances underlying the abuse never came to light so that those issues might be addressed directly.

{¶32} Although Mother and Father are no longer romantically involved with one another, they remain close friends and share a residence with the intent to raise the child together. In their current home, M.T. has his own bedroom with all necessary furnishings. The child has clothing and toys in the parents' home, as well. Father has a separate bedroom, while Mother sleeps in a finished portion of the basement. Although Mother has no plans to leave the residence she shares with Father, she has been approved and is on a waiting list for subsidized housing should the need for that arise.

{¶33} Both parents have significant others. CSB has no concerns regarding those people based on public records checks. Mother's boyfriend, however, refused to speak with the caseworker or guardian ad litem. Neither parent's significant other spends the night at the parents' home, although Mother admitted that she spends the night at her boyfriend's home approximately once a week. Neither Father's girlfriend nor Mother's boyfriend have met M.T. Mother and her boyfriend have not discussed how or when the child might be incorporated into their relationship. There was no evidence regarding what the parents' significant others thought about Mother and Father continuing to share a home, and occasionally a bed, albeit platonically.

{¶34} Mother and Father each work full time. Together, they are financially able to provide for all the child's needs. Their staggered work schedules allow one parent to care for M.T. at all times except for a brief 2-hour period five days a week when their work schedules overlap. Mother and Father have arranged for the maternal grandmother, a paternal relative, and some of Mother's coworkers to provide care for the child during those times. In addition, Mother is able to leave her job during her shift as a waitress to care for the child in urgent or emergency situations. At some point in the future, assuming good relations can be restored, Mother and Father would consider letting Grandparents babysit M.T., as well. The guardian ad litem opined that cutting Grandparents out of the child's life would be traumatic for M.T. based on his established bond with them.

{¶35} M.T. is too young to express his wishes regarding custody. Notwithstanding Mother's and Father's case plan compliance, appropriate home, and implementation of proper parenting skills, the guardian ad litem recommended legal custody to Grandparents based on the lack of a formal lease for the home Father is renting from a family member, and the lack of time the parents have had to parent the child on a day-to-day basis. Because of the child's special needs, the guardian opined that a consistent childcare plan is necessary. She conceded, however, that other caregivers like the maternal grandmother and others could learn without difficulty how to care for M.T. She simply emphasized that Grandparents are much more familiar with the child's routine.

{¶36} The guardian ad litem had no explanation for why there had been no discussions to expand the parents' visitation further despite how well their unsupervised visits had been going. Because of her belief that the parents' visitation might become more limited if left to the discretion of Grandparents, the guardian ad litem recommended that Mother and Father be awarded court-

ordered visitation based on at least the standard order of visitation, to include holiday visits and parameters for increasing visitation over time.

{¶37} In sustaining Grandparents' objections and rejecting the magistrate's decision to award legal custody to Mother, the juvenile court placed enormous weight on the significant amount of time M.T. had been in Grandparents' custody. It downplayed, however, the roadblocks Grandfather placed in the way of the parents' reunification with the child when he rejected numerous requests for visits and failed to inform Mother and Father regarding the child's appointments. Grandfather's interference with the parents' interaction with M.T. is even more troubling given Grandfather's admission that he planned from the very beginning of the case to obtain legal custody of the child.

{¶38} More concerning is the juvenile court's minimization of certain behaviors by Grandparents. For example, although she did not live or work nearby, Grandmother admitted to driving by the parents' home every day at all hours of the day and night to see if Mother's car was there based on her belief that the parents were not really living together. Despite the parents' assertions regarding their living situation and their demonstrated ability to keep the child safe, Grandmother's daily monitoring evidenced her pervasive lack of trust of Mother and Father.

{¶39} In addition, despite recognizing that the child's injuries occurred as a result of physical abuse, the juvenile court ignored Grandfather's threat of physical violence towards Father during the case. In fact, the trial court failed to mention Grandfather's admission that he had threatened for some undisclosed reason to shoot Father in the face.

{¶40} Perhaps most unclear is the lack of significance the juvenile court placed on Grandfather's current use of alcohol. After admitting that he had once been hospitalized based on an alcohol-related incident, Grandfather testified that he remained sober for 20 years. However,

when M.T. was placed in his temporary custody, Grandfather admitted that he resumed drinking, although he could not articulate why. Grandfather denied any current substance abuse issues. Although neither the caseworker nor guardian ad litem reported any concerns for such issues in Grandparents' home, CSB did not investigate despite the recommendation of a professional at Summit Psychological Associates that any caregiver for the child should be assessed for mental health and substance abuse issues. At a minimum, Grandfather's lapse from sobriety, in light of his admitted history, threat of violence against Father, and controlling and contentious behavior towards Mother and Father, should have raised some concern regarding his propriety as a primary caregiver for the child.

{¶41} After a thorough review of the record, I would conclude that neither pending dispositional option was in the best interest of the child at the time of the hearing. Significantly, the magistrate who heard the evidence and the judge who reviewed the record arrived at disparately reasoned conclusions. The magistrate's articulated confidence that the best interest of the child would be met by being returned to Mother's legal custody was rivaled by that of the judge who emphasized the significance of the child's custodial history with Grandparents.

{¶42} Both the magistrate and judge ignored critical evidence which mitigated the bases for their respective dispositional orders. For example, the magistrate minimized the child's multiple fractures as a result of abuse inflicted during the three weeks in the parents' home before his removal. The circumstances of those abusive acts remain unknown and, therefore, possibly unresolved. Instead of focusing on the child's future safety in an environment of uncertainty, the magistrate viewed the efforts of various professionals involved in the case to identify the perpetrator simply as "barriers for [the parents] to reunify." The extent of M.T.'s injuries which were sustained during indeterminate circumstances, in conjunction with the child's ongoing

inability to self-protect or even communicate to report further incidents of abuse, weigh heavily in this matter.

{¶43} On the other hand, the judge failed to mention Grandfather's threat of physical violence against Father during the case. The threat of shooting Father in the face cannot be ignored when an abused child's safety is at issue. Moreover, the judge downplayed Grandfather's resumption of alcohol use after a 20-year period of sobriety after an alcohol-related hospitalization, notwithstanding the recommendation of a mental health professional that all caregivers for the child submit to mental health and substance abuse assessments.

{¶44} In addition, it is difficult for me to reconcile the juvenile court's finding that an award of legal custody to Grandparents was in the child's best interest despite its acknowledgement of certain significant concerns. For example, the judge noted Grandfather's multi-day delays in returning Mother's texts regarding her weekly visitation schedule. While the judge found that Mother "was [n]ever denied a visit as a result of this delay[,]" Mother's text messages admitted into evidence clearly showed that Grandfather routinely rejected at least one proposed visit each week. The judge also expressed "great[ ] concern" regarding Grandparents' habit of withholding information from Mother and Father regarding the child and his appointments "unless specifically requested" by the parents. The hurdles erected by Grandparents to interfere with the parents' residual rights demonstrate grave concerns about their willingness to facilitate and preserve an ongoing relationship between the child and his parents.

{¶45} In my opinion, the record in this case demonstrates that neither proposed custodial disposition was in the child's best interest at the time of the hearing. Mother and Grandparents each exhibit strengths and weaknesses in their respective abilities to raise the child. Unfortunately, the ongoing concerns regarding both Mother and Grandparents preclude me from making a well-

substantiated determination based on the evidence adduced at the hearing that an award of legal custody to either is in the child's best interest. Accordingly, I would conclude that the juvenile court's judgment awarding legal custody to Grandparents is against the manifest weight of the evidence. Because the preponderance of the evidence does not support granting legal custody to either Mother or Grandparents, I would reverse the judgment and remand the cause for further proceedings.

SCHAFER, J., CONCURRING IN JUDGMENT ONLY.

{¶46} Although I too agree that the juvenile court's judgment should be reversed, I am compelled to write separately because I would sustain Mother's assignment of error and reinstate the magistrate's award of legal custody to Mother. As such, I disagree with the dissent's proposal to affirm the judgment which awarded legal custody to Grandparents.

{¶47} When considering a manifest weight of the evidence challenge, a reviewing court "must always be mindful of the presumption in favor of the finder of fact." *Eastley v. Volkman*, 132 Ohio St.3d 328, 2012-Ohio-2179, ¶ 21. In this case, the magistrate had the opportunity to observe the parties' and witnesses' demeanor during the hearing. As such, the magistrate was in the best position to assess credibility.

{¶48} The evidence supported the finding that an award of legal custody to Mother was in the child's best interest. The goal of the case plan was reunification, and Mother successfully completed her case plan objectives. While not dispositive of the issue of custody, case plan compliance is relevant to the juvenile court's determination regarding the best interest of the child. *In re T.H.*, 9th Dist. Summit No. 28833, 2018-Ohio-1143, ¶ 12. Mother and Father established a home together and demonstrated a commitment to raise M.T. as a family. The parents' home is appropriate, and they can meet the child's basic and special needs. The child remained safe while

with Mother and Father, and no one expressed any concerns regarding the parents' interactions with M.T. The child is comfortable with Mother and Father and the family unit shares a bond. Grandparents provided good care for the child, but they remained hostile towards Mother and Father. Grandfather in particular was never forthcoming regarding important information about the child unless the parents expressly asked specific questions. In addition, Grandfather habitually curtailed the parents' opportunities to spend time with the child, even on holidays. Although Mother and Father enjoyed more visitation with the child than they likely would have had, had M.T. been in CSB's temporary custody, they were never accorded the amount of visitation they requested and CSB recommended.

{¶49} The evidence adduced at the hearing demonstrates shortcomings of all three proposed legal custodians. Moreover, the nature of the abuse suffered by the child as a newborn while residing in a home with four adults for only three weeks is extremely troubling and I do not make light of it. It is important to note, however, that M.T. has suffered no harm throughout the case while in the parents' care, and none of the professionals involved in the case have expressed any concerns about the care either parent has provided. Years have passed, and the situations involving a newborn versus a preschooler are markedly different. Furthermore, the child will continue to receive services from Help Me Grow and Stark or Summit DD whose providers are mandatory reporters of suspected abuse. M.T. is almost four years old and will eventually attend school. Such oversight, along with the child's developing communication skills, confers greater confidence in the decision to return the child to Mother.

{¶50} Given the evidence in this case, I would decline to second guess the magistrate as the trier of fact in the best position to assess the evidence and credibility of the witnesses. The preponderance of the evidence supports the magistrate's finding that legal custody of M.T. to

Mother was in the child's best interest. Mother's successful completion of her case plan objectives, in conjunction with her care of the child, demonstrated her ability to keep M.T. safe. Accordingly, I would sustain Mother's assignment of error and conclude that the juvenile court's judgment sustaining Grandparents' objections and rejecting the magistrate's decision was against the manifest weight of the evidence.

CARR, J., DISSENTING.

{¶51} I respectfully dissent because I would affirm the juvenile court's judgment awarding legal custody of M.T. to Grandparents. Given her disregard of certain evidence, I would not accord deference to the magistrate's findings in this case.

{¶52} The goal of any agency case plan is to remedy the conditions that led to the child's removal from the home so that family reunification might be possible. The significant issue underlying M.T.'s removal from his parents was the abuse the child suffered as an infant. R.C. 3109.04(F)(1)(h) requires the trial court to consider as a relevant best interest factor " * * * whether there is reason to believe that either parent has acted in a manner resulting in a child being an abused child or a neglected child[.]" Even in the absence of the identification of a specific perpetrator or incident, the trial court must consider whether any indicia of abuse or neglect existed. *See In re L.S.*, 9th Dist. Summit No. 28475, 2018-Ohio-5116, ¶ 42-43.

{¶53} During a mere three weeks in the parents' home and physical custody, M.T. sustained multiple rib fractures, as well as a broken femur and clavicle, in various stages of healing, indicating multiple incidents of abuse over a very short period of time. Throughout the lengthy duration of the case, neither parent offered any reasonable insight as to how the child suffered those injuries. Although encouraged by the caseworker, guardian ad litem, and even the Fast Track service provider to cooperate with the police investigation, take polygraph examinations, or

otherwise acknowledge or admit the abuse, Mother and Father steadfastly denied any knowledge of the circumstances that resulted in the child's injuries. The only cause proposed by Mother was that the child's car seat strap was too tight, resulting in fractures as she drove with the child over a rough roadway. Mother could not explain how that might have resulted in the myriad of fractures sustained by the child over different periods of time. Nevertheless, both Mother and Father stipulated that the child was abused. Given the child's numerous fractures sustained during the short time he resided with Mother and Father, it is more than reasonable to believe that one or both of the parents' actions resulted in M.T.'s abuse. *See* R.C. 3109.04(F)(1)(h). Unlike the juvenile judge, the magistrate disregarded this best interest factor.

{¶54} Without any admission, or even a reasonable acknowledgement, of the child's abuse, the precise circumstances underlying the child's abuse remained unknown throughout the case. No perpetrator was identified. No person with any knowledge of the perpetrator came forward, although I again emphasize that both parents stipulated that M.T. was in fact abused. Without further clarification, however, no stressors or other issues which precipitated the abuse in the parents' home could, therefore, be identified and addressed via case plan objectives. As those issues have necessarily not yet been identified, let alone resolved, there remains a risk to the child's safety in the parents' home. The child has delayed communication skills and may, therefore, be unable to relay fear or incidents of harm. He is still too young to self-protect. My concern is that the child's physical safety in the parents' home is too speculative.

{¶55} Other conditions in the parents' home also raise concerns for the child's well-being. Although Mother and Father have ended their romantic involvement, they claim to continue to reside together to provide a stable family home for M.T. However, both parents have established serious relationships with significant others. Neither of those people has met M.T. Mother's

boyfriend was not cooperative with CSB in conducting a full background check because he did not want to become involved in the case. Mother did not wish to involve her boyfriend in the child's life unless and until she received custody. Accordingly, although a public records check did not identify any issues, the interactions and relationship between M.T. and his parents' significant others remain unknown. It is also unknown how the significant others will react if Mother and Father continue a long-term live-in relationship.

{¶56} I would also question Mother's ability to provide M.T. with a stable home. During the case below, the parents lived in at least three different residences. Mother was not on the lease for any of those homes. I am also concerned regarding Mother's childcare plans for the child. She intends to have the maternal grandmother care for the child when the parents' work schedules overlap. It should not be ignored that the maternal grandmother was also living in the home where the child suffered abuse. There is no evidence regarding the maternal grandmother's role in or knowledge of the child's abuse. Accordingly, it remains unknown whether Mother's childcare plans will maintain M.T. in a safe environment. Although I acknowledge that the child suffered no reported injuries during his unsupervised visits with his parents during the last few months of the case, Mother demonstrated an ability to keep the child safe under very limited conditions, rather than during long-term sustained periods of care.

{¶57} On the other hand, M.T. is well established in a safe and stable environment with Grandparents where all the child's needs are met. Despite evidence that Grandfather had resumed using alcohol, he testified that he does not abuse it. Significantly, neither the caseworker nor the guardian ad litem had any concerns that Grandfather's use of alcohol was problematic. Moreover, although Grandfather acknowledged threatening Father, even Father admitted that Grandfather

does not possess any firearms. There was no evidence that Grandfather ever physically assaulted Father or any other person.

{¶58} Although Grandparents did not offer information to the parents regarding the child's appointments, they believed they were following the caseworker's suggestion to require Mother and Father to be more proactive in their involvement in the child's life. CSB had concerns that Mother in particular was not as assertive as she needed to be in her role as a parent.

{¶59} While Grandfather did not approve every time and date that Mother proposed for visitation, he always allowed her to visit with M.T. a couple times a week. The parents received more visitation time with the child than they would have if CSB were the temporary custodian due to the parents' and Grandparents' flexibility. Mother and Father were awarded liberal visitation by the juvenile court as the parties might agree. If they could not agree, then the parties would be bound by the court's standard order of visitation. Accordingly, the parents' visitation rights were protected and could be enforced through the contempt power of the juvenile court in the event that Grandparents did not comply.

{¶60} Based on my thorough review of the record, I would conclude that the juvenile court's judgment was not against the manifest weight of the evidence. I believe that the preponderance of the evidence supports the finding that an award of legal custody to Grandparents was in the child's best interest. Accordingly, I dissent from the majority opinions as I would affirm the juvenile court's judgment.

APPEARANCES:

EMILY M. HETE, Attorney at Law, for Appellant.

SHERRI BEVAN WALSH, Prosecuting Attorney, and HEAVEN R. DIMARTINO, Assistant Prosecuting Attorney, for Appellee.

LEONARD BREIDING, Attorney at Law, for Appellee.

JOY WAGNER, Attorney at Law, for Appellee.

PAMELA HAWKINS, Guardian ad Litem.