[Cite as *In re A.J.K.*, 2022-Ohio-4336.]

COURT OF APPEALS
COSHOCTON COUNTY, OHIO
FIFTH APPELLATE DISTRICT

|  |  |  |
|---|---|---|
|  | : | JUDGES: |
|  | : |  |
|  | : | Hon. Earle E. Wise, Jr., P.J. |
|  | : | Hon. W. Scott Gwin, J. |
|  | : | Hon. Patricia A. Delaney, J. |
| IN RE A.J.K. | : |  |
|  | : | Case No. 2022CA0014 |
|  | : |  |
|  | : |  |
|  | : |  |
|  | : |  |
|  | : |  |
|  | : | O P I N I O N |

| | |
|---|---|
| CHARACTER OF PROCEEDING: | Appeal from the Coshocton County Court of Common Pleas, Juvenile Division, Case No. 21930096 |
| JUDGMENT: | AFFIRMED |
| DATE OF JUDGMENT ENTRY: | December 2, 2022 |

APPEARANCES:

| | |
|---|---|
| For Father-Appellant: | For CCJFS-Appellee: |
| DEBORAH FRIES<br>2760 Oxford Dr.<br>Nashport, OH 43701 | FREDERICK A. SEALOVER<br>725 Pine Street<br>Coshocton, OH 43812 |

*Delaney, J.*

{¶1} Father-Appellant appeals the March 3, 2022 judgment entry of the Coshocton County Court of Common Pleas, Juvenile Division, granting legal custody of his minor child to N.J.M.

## FACTS AND PROCEDURAL HISTORY

{¶1} While Mother and Father-Appellant were residing in Oklahoma, the State of Oklahoma terminated their parental rights as to N.P., their child born in approximately 2014. Mother and Father suffered from severe drug addiction and failed to abide by their case plan. N.P. was placed in the temporary custody of A.P. and D.P. ("Adoptive Parents"), who later adopted N.P. on September 6, 2016. Adoptive Parents reside with N.P. in Oklahoma. In 2020, N.P. was six years old.

{¶2} Adoptive Parents remained in contact with Father and Father's mother after the adoption of N.P. by providing them with pictures of the child. Adoptive Parents communicated with Father through Messenger, but they would not permit Father to have physical contact with N.P. due to his drug use.

{¶3} On February 23, 2019, Father contacted Adoptive Parents on Messenger and informed them that Mother had given birth to their child, A.J.K. Mother gave birth to A.J.K. at home because they were concerned the child would be removed from their care. Adoptive Parents did not know where Father and Mother were residing at the time of A.J.K.'s birth. Adoptive Parents contacted Oklahoma Children's Services regarding A.J.K.'s birth but could not provide the agency with Father's address.

{¶4} Father contacted Adoptive Parents monthly with photos of A.J.K. He stated that he, A.J.K., and Mother were fine.

{¶5} In August 2019, Father contacted Adoptive Parents on Messenger and stated he had to get A.J.K. away from Mother and he needed to leave Oklahoma. Father alleged to Adoptive Parents that Mother was drugged out and she wasn't going to recover. Adoptive Parents were ready to help A.J.K. but Father would not give them his location. Adoptive Parents believed that he wanted to leave Oklahoma with the child because if they became involved, they would contact Oklahoma Children's Services.

{¶6}   He told Adoptive Parents that he had also contacted his former foster sister, N.J.M. to get the baby out of Oklahoma. When N.J.M. was a teenager, she was placed in the temporary custody of Father's mother. N.J.M. resides in Coshocton County with her husband, T.M. N.J.M. has two adult children and two grandchildren. Father and N.J.M. had remained in contact with each other.

{¶7}   With the encouragement and financial assistance of Father's mother, N.J.M. and T.M. drove to Oklahoma to get Father and A.J.K. N.J.M. and T.M. located Father and A.J.K. living in a hotel room with other adults of ill repute. N.J.M. observed a cigarette burn on A.J.K.'s leg, which Father alleged was caused by a cigarette falling on the baby's leg while her diaper was changed. In August 2019 when A.J.K. and Father came to be with N.J.M., A.J.K. was five months old.

{¶8}  The goal of removing Father from Oklahoma and bringing them to Ohio was so N.J.M. could assist Father attain sobriety while she cared for A.J.K. Father was going to rent a trailer on N.J.M.'s property while he went through rehab.

{¶9}  After they came back to Ohio, at some point Father returned to Oklahoma. He wanted N.J.M. to be A.J.K.'s guardian while he was in Oklahoma. N.J.M. and Father found guardianship forms on the internet, which Father signed consenting to N.J.M.'s

guardianship of A.J.K. Father then returned to Oklahoma. Adoptive Parents were aware that Father and Mother were in Oklahoma in October 2019.

{¶10} On September 25, 2019, N.J.M. filed a motion for legal custody of A.J.K. with the Coshocton County Court of Common Pleas, Juvenile Division. The juvenile court made a formal referral to Coshocton County Job and Family Services-Appellee ("CCJFS") on September 26, 2019. The matter came before the juvenile court on October 30, 2019, but neither Mother nor Father appeared. The juvenile court continued the matter to January 3, 2020.

{¶11} In November 2019, CCJFS assigned A.J.K. an ongoing caseworker.

{¶12} On December 9, 2019, CCJFS filed a complaint for dependency, alleging A.J.K. was a neglected and dependent child while in the care of Mother and Father.

{¶13} Mother died from a drug overdose on December 13, 2019.

{¶14} The juvenile court held a hearing on January 7, 2020 for pre-dispositional interim orders. Father did not appear at the hearing. One of the notable issues at the hearing was the lack of a birth certificate for A.J.K., so that her birth date, parentage, and place of birth could not be verified. The juvenile court was informed that A.J.K. was born in Oklahoma but Mother and Father failed to secure a birth certificate for the child. The juvenile court then ordered Father and A.J.K. to submit to genetic testing. CCJFS was ordered to investigate and secure legal documents, including a birth certificate for A.J.K. and a death certificate for Mother. A.J.K. was placed in the emergency temporary custody of N.J.M. and in the protective supervision of CCJFS. A Guardian ad Litem was appointed for A.J.K.

{¶15} Father appeared at the juvenile court on January 8, 2020. CCJFS was contacted to meet with Father.

{¶16} CCJFS established a case plan for Father on January 30, 2020. Father was to participate in drug and alcohol treatment, obtain employment, obtain housing, submit Mother's death certificate, obtain A.J.K.'s birth certificate, and complete a parenting assessment and classes.

{¶17} The Notice of Genetic Test Results were filed on February 13, 2020, identifying Mother and Father as the biological parents of A.J.K.

{¶18} The juvenile court held the adjudicatory and dispositional hearings on March 4 and March 5, 2020. By judgment entry filed July 29, 2020, the juvenile court found A.J.K. to be a dependent and neglected child. A.J.K. was ordered to remain in the temporary custody of N.J.M. and in the protective supervision of CCJFS. Father was permitted supervised visitation if he tested negative for all illegal substances and all substances not currently prescribed. The juvenile court continued its prior order that Father should cooperate with CCJFS to provide birth records for A.J.K. and CCJFS was to obtain legal documents for A.J.K.'s birth and Mother's death.

{¶19} Pursuant to drug testing, Father tested positive for marijuana, oxycodone, morphine, and fentanyl and was accordingly not permitted visitation with A.J.K.

{¶20} On June 1, 2020, CCJFS filed a motion to change custody of A.J.K. to the Adoptive Parents. CCJFS received notice on May 4, 2020 that the Interstate Compact Placement for Children ("ICPC") was approved by the Oklahoma Department of Children Services, which indicated that Adoptive Parents were appropriate custodians for A.J.K.

N.J.M. objected to the CCJFS proposed change in custody but later withdrew her objection. N.J.M. renewed her objection on July 29, 2020.

{¶21} On July 31, 2020, CCJFS withdrew its motion to change custody of A.J.K.

{¶22} Prior to the CCJFS motion to change custody, Adoptive Parents and N.J.M. had been in contact regarding A.J.K. They had exchanged photos of N.P. and A.J.K. N.P. was aware that he had a sibling and Adoptive Parents told him that his sibling was coming to live with them. N.P. never had physical contact or interaction with A.J.K. After CCJFS withdrew the motion to change custody, contact between the Adoptive Parents and N.J.M. stopped due to potential conflict between the families.

{¶23} On October 1, 2020, Adoptive Parents filed a notice of appearance, motion to intervene, and motion to modify disposition. The juvenile court set the matters for hearing on November 3, 2020, but continued the matter to December 2, 2020 due to Father's absence. N.J.M. filed an objection to the intervention of Adoptive Parents.

{¶24} CCJFS filed a motion for six-month extension on November 24, 2020 to allow more time to obtain A.J.K.'s birth certificate from Oklahoma.

{¶25} The hearing on the Adoptive Parents' motions went forward on December 2, 2020. Father was not present at the hearing. In October 2020, Father was involuntarily admitted to the Appalachian Behavioral Healthcare facility located in Athens, Ohio. Father had been released from the facility at the time of the hearing but could not be located.

{¶26} Adoptive Parents and a child welfare specialist with the Oklahoma Department of Human Services testified at the December 2, 2020 hearing. Adoptive Parents were found to be suitable custodians for A.J.K. through the ICPC. While there was no bond between A.J.K. and N.P., the Oklahoma child welfare specialist testified that

keeping the siblings together was as important as the level of care A.J.K. was receiving, and she would receive a high level of care by Adoptive Parents. The CCJFS ongoing case worker testified that N.J.M.'s home was determined to be suitable for A.J.K. The child had been with N.J.M. since she was five months old and at the time of the hearing, was 15 months old. She was bonded with N.J.M. and thriving. Under Ohio law, both Adoptive Parents and N.J.M. would be considered kinship placement. N.J.M. and T.M. testified they would maintain the relationship between the siblings and had only stopped contact due to the CCJFS motions for change of custody and subsequent withdrawal of the motion. N.J.M. was 52 years old at the time of the hearing and both she and T.M. smoked, but outside the presence of A.J.K. The GAL recommended continued placement with N.J.M.

{¶27} On January 14, 2021, the juvenile court issued its judgment entry finding that it was in the best interests of A.J.K. to remain in temporary custody of N.J.M. and denied all motions for custody and intervention by Adoptive Parents. The trial court further granted the six-month extension filed by CCJFS. The January 30, 2020 case plan for Father was approved by the juvenile court.

{¶28} On March 24, 2021, Adoptive Parents filed a complaint for third-party custody of A.J.K. CCJFS filed a motion requesting another extension of temporary custody on May 24, 2021. On June 21, 2021, Adoptive Parents filed a motion to temporary custody of A.J.K., sponsored by Father.

{¶29} The juvenile court held a hearing on Adoptive Parents' motion for temporary custody on September 28, 2021. The parties agreed the juvenile court would take judicial notice of the December 2, 2020 hearing. The main issue raised at the September 28,

2021 hearing was that in January 2020, a blood test conducted due to concerns about A.J.K.'s exposure to drugs in utero showed that A.J.K. had elevated lead levels. The optimal lead level is zero, but A.J.K.'s level was five. At the direction of her pediatrician, A.J.K. was tested again in March 2021 and her lead level had increased to 29. A.J.K. was referred to the Akron Children's Hospital lead clinic, where she was examined and found to exhibit no outward symptoms or changes in mental status due to her lead levels. She was already treating with a speech pathologist due to speech delays but the Akron Children's physician could not definitively link A.J.K.'s speech issues with her lead levels. A.J.K.'s lead levels were not so high as to require medication; the doctor recommended amelioration in the home to remedy her lead levels.

{¶30} N.J.M. and her husband worked with the Coshocton County Health Department and private contractors to conduct a lead assessment of their home. It was determined that upon remodeling the home, they installed antique wood containing lead. T.M. sealed and painted the wood according to the recommendations of the lead assessment. They discovered some furniture contained lead dust, which N.J.M. removed from the home. After the improvements were made to the home, A.J.K.'s lead levels decreased and on August 31, 2021, she tested at a level of 19. A.J.K. was discharged from the lead clinic and directed to follow up with her pediatrician. During the process, the Akron Children's physician found N.J.M. to be appropriate with A.J.K., asked questions, and made the necessary changes to address the lead issues.

{¶31} Father's mother testified at the hearing. She was over 80 years old and resided in Florida. She testified that she did not feel N.J.M. was fit to be the custodian for A.J.K. based on her experiences with N.J.M. as her foster child over 30 years ago.

Father's mother felt Adoptive Parents would be better custodians. Father's mother assisted N.J.M. with obtaining a guardianship of A.J.K. when she brought Father and A.J.K. to Ohio.

{¶32} Father appeared at the September 28, 2021 hearing. He testified that A.J.K. has four siblings: N.P. and three half-siblings by Mother. Mother had lost custody of those siblings. Father wanted A.J.K. to be with N.P. and provided Adoptive Parents with his written consent for them to have custody of A.J.K. He stated he took A.J.K. to N.J.M. because he wanted someone to watch the child while he detoxed. He entered into a guardianship with N.J.M. for A.J.K. because he needed to go back to Oklahoma for his probation. N.J.M. was Father's only connection to Ohio. While he was in Ohio, Father stated he was working his case plan, had obtained employment, housing, and was no longer taking drugs.

{¶33} The CCJFS ongoing case worker testified that she saw A.J.K. once a month. She observed that A.J.K. called N.J.M. and T.M. "mom" and "dad." A.J.K. was receiving services from Help Me Grow, speech therapy, a nutritionist, and Early Head Start. The only issue she had with A.J.K.'s care was the lead issue, which was being addressed. She felt it would be harmful to A.J.K. to be removed from Ohio because she had been with N.J.M. for two years. CCJFS planned to file a motion for legal custody after it received A.J.K.'s birth certificate from Oklahoma.

{¶34} The GAL recommended temporary custody continue with N.J.M.

{¶35} By judgment entry filed on October 21, 2021, the juvenile court denied the Adoptive Parents' motion for temporary custody and found it was in the best interests of A.J.K. for the continued placement with N.J.M.

{¶36} On October 15, 2021, CCJFS filed a motion for legal custody and case closure. The hearing was held on December 22, 2021. The parties agreed at the hearing that the juvenile court would take judicial notice of the December 2, 2020 and September 28, 2021 hearings.

{¶37} The CCJFS ongoing caseworker testified at the hearing that Father was not in compliance with his case plan. Once she was able to locate Father, he refused to speak with her. As to A.J.K., the ongoing caseworker testified that she had no concerns for the care she was receiving from N.J.M. Her lead levels were continuing to decline, and she tested at 14 in December. She had no other medical issues. She was receiving services through Help Me Grown and Early Head Start. The ongoing case worker testified it was in the best interests of A.J.K. that legal custody be granted to N.J.M.

{¶38} The GAL recommended legal custody be granted to N.J.M.

{¶39} By judgment entry filed on March 3, 2022, the juvenile court found it was in the best interests of A.J.K. to be placed in the legal custody of N.J.M. CCJFS had made reasonable efforts to reunify A.J.K. with Father, but Father failed to utilize the services in his case plan. The protective supervision of CCJFS was terminated and the case closed.

{¶40} It is from this judgment entry that Father now appeals.

**ASSIGNMENTS OF ERROR**

{¶41} Father raises two Assignments of Error:

{¶42} "I. THE TRIAL COURT ERRED IN GRANTING LEGAL CUSTODY TO A.K. TO A NON-RELATIVE [SIC] WAS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE AND WAS NOT IN THE BEST INTEREST OF THE CHILD.

{¶43} "II. THE COURT ERRED IN DENYING THE [ADOPTIVE PARENTS] MOTION TO INTERVENE AND DENYING THEM THIRD-PARTY STATUS."

**ANALYSIS**

**I. Legal Custody**

{¶44} In his first Assignment of Error, Father contends the trial court abused its discretion when it awarded legal custody of A.J.K. to N.J.M. We disagree.

{¶45} N.J.M. is a non-parent. Before awarding legal custody to a non-parent, a trial court must ordinarily make a finding that each parent is unsuitable. *In re L.P.*, 5th Dist. Muskingum No. CT2016-0045, 2017-Ohio-52, ¶ 18 citing *In re L.M.,* 2nd Dist. Greene No. 2010–CA–76, 2011–Ohio-3285, ¶ 18 citing *In re Hockstock*, 98 Ohio St.3d 238, 2002–Ohio–7208, 781 N.E.2d 971. This requirement does not apply, however, in cases involving abuse, neglect, or dependency. *Id.* The Ohio Supreme Court in *In re C.R.* held "[a] juvenile court adjudication of abuse, neglect, or dependency is a determination about the care and condition of a child and implicitly involves a determination of the unsuitability of the child's custodial and/or noncustodial parents." 108 Ohio St.3d 369, 2006–Ohio–1191, 843 N.E.2d 1188, paragraph one of syllabus. Thus, "[w]hen a juvenile court adjudicates a child to be abused, neglected, or dependent, it has no duty to make a separate finding at the dispositional hearing that a noncustodial parent is unsuitable before awarding legal custody to a nonparent." *In re L.M.*, 2011–Ohio–3285 quoting In re C.R., 108 Ohio St.3d 369, paragraph two of syllabus.

{¶46} In this case, A.J.K. was adjudicated a dependent and neglected child.

**Standard of Review**

{¶47} Custody issues are some of the most difficult and agonizing decisions a trial court judge must make; for that reason, the trial court is given "wide latitude in considering all the evidence." *Davis v. Flickinger*, 77 Ohio St.3d 415, 418, 674 N.E.2d 1159 (1997). "A trial court has broad discretion in proceedings involving the care and custody of children." *In re Mullen*, 129 Ohio St.3d 417, 2011–Ohio–3361, ¶ 14. We review the award of legal custody for an abuse of discretion. *In re L.D.* at ¶ 8; *In re Gales*, 10th Dist. No. 03AP–445, 2003–Ohio–6309, ¶ 13; *In re N.F.*, 10th Dist. No. 08AP–1038, 2009–Ohio–2986, ¶ 9, citing *In re Nice*, 141 Ohio App.3d 445, 455 (7th Dist.). Abuse of discretion connotes more than an error of law or judgment; rather, it implies that the trial court's decision was unreasonable, arbitrary, or unconscionable. *Blakemore v. Blakemore*, 5 Ohio St.3d 217, 219 (1983). We must presume that the trial court's findings are correct because the trial court is "best able to view the witnesses and observe their demeanor, gestures and voice inflections, and use these observations in weighing the credibility of the proffered testimony." *Seasons Coal Co. v. Cleveland*, 10 Ohio St.3d 77, 80, 461 N.E.2d 1273 (1984). Therefore, deferential review in a child custody determination is especially crucial "where there may be much evident in the parties' demeanor and attitude that does not translate to the record well." *Davis* at 419.

{¶48} Unlike a permanent custody proceeding where a juvenile court's standard of review is by clear and convincing evidence, the standard of review in legal custody proceedings is a preponderance of the evidence. *In re J.W.*, 5th Dist. Richland No. 2021 CA 0007, 2021-Ohio-2917, ¶ 40; *In re S.D.*, 5th Dist. Stark Nos. 2013CA0081,

2013CA0082, 2013–Ohio–5752, ¶ 32; *In re A.C.*, 12th Dist. No. CA2006–12–105, 2007–Ohio–3350 at ¶ 14; *In re Nice*, 141 Ohio App.3d 445, 455, 751 N.E.2d 552 (7th Dist.2001).

**Best Interests of the Child**

{¶49} In this type of dispositional hearing, the focus is on the best interest of the child. *In re T.B.*, 5th Dist. Muskingum No. CT2018-0065, 2019-Ohio-1747, 2019 WL 2041906, ¶ 26 citing *In re C.R.*, 108 Ohio St.3d 369, 2006–Ohio–1191, 843 N.E.2d 1188; *In re P.S.*, 5th Dist. No. 2012CA00007, 2012–Ohio–3431. Despite the differences between a disposition of permanent custody and legal custody, some Ohio courts have recognized "the statutory best interest test designed for the permanent custody situation may provide some 'guidance' for trial courts making legal custody decisions." *In re A.F.,* 9th Dist. No. 24317, 2009–Ohio–333 at ¶ 7, citing *In re T.A.*, 9th Dist. No. 22954, 2006–Ohio–4468 at ¶ 17; *In re S.D.* 5th Dist. Stark Nos. 2013CA0081, 2013CA0082, 2013–Ohio–5752, ¶ 33. R.C. 2151.414(D) sets forth factors to be considered in making a determination regarding the best interest of the child.

{¶50} In that regard, the juvenile court is guided by the best interest factors enunciated in R.C. 2151.414(D) relating to permanent custody. *In re J.W.*, 2021-Ohio-2917, ¶ 42 citing *In re M.T.*, 9th Dist. Summit No. 29690, 2020-Ohio-5493, 2020 WL 7055379, ¶ 20 citing *In re B.G.*, 9th Dist. Summit No. 24187, 2008-Ohio-5003, ¶ 9, citing *In re T.A.*, 9th Dist. Summit No. 22954, 2006-Ohio-4468, ¶ 17. Those factors include the interaction and interrelationships of the child, the child's wishes, the custodial history of the child, the child's need for permanence, and whether any of the factors in R.C. 2151.414(E)(7)-(11) are applicable. *In re M.T.* at ¶ 20 citing R.C. 2151.414(D)(1)(a)-(e). In addition, the juvenile court may also look to the best interest factors in R.C.

3109.04(F)(1) for guidance. *In re M.T.* at ¶ 20 citing *In re K.A.*, 9th Dist. Lorain Nos. 15CA010850, 15CA010860, 2017-Ohio-1, ¶ 17. "While some factors overlap with those above, others include the child's adjustment to his or her environment; the mental and physical health of all persons involved; the parents' history of providing support and honoring companionship orders; whether a parent plans to or has established a residence outside of Ohio; and certain indicia of violence, abuse, or neglect in any household involved. R.C. 3109.04(F)(1). Such indicia include convictions relating to the abuse or neglect of a child, as well as whether there exists any 'reason to believe that either parent has acted in a manner resulting in a child being an abused or a neglected child[.]' R.C. 3109.04(F)(1)(h)." *Id.* at ¶ 20.

{¶51} Father contends in his first Assignment of Error that the juvenile court abused its discretion when it awarded legal custody of A.J.K. to N.J.M. by failing to consider some of the best interest factors. He argues the juvenile court failed to consider his wishes as parent that Adoptive Parents should be awarded legal custody because they could provide better care for A.J.K. and they were the parents of A.J.K.'s sibling. He acknowledged that removing A.J.K. from the care of N.J.M. would be challenging for A.J.K., but the benefit of being placed with her sibling outweighed the temporary trauma to A.J.K.

{¶52} While born into challenging circumstances, A.J.K. now has two families asking to care for her. The preponderance of the evidence shows that both families are appropriate and will provide for her. There are two key differences between the families. One, A.J.K. has lived with N.J.M. and her husband since she was five months old. She

has integrated into the family, calling N.J.M. and T.M., "mom" and "dad." Two, Adoptive Parents are the parents of A.J.K.'s sibling.

{¶53} Father argues the placement of A.J.K. with her sibling is preeminent to any consideration of A.J.K.'s integration with the N.J.M. family. Father cites this Court to R.C. 2151.411, which states:

> Whenever a child comes into the custody of a public children services agency, either as part of a sibling group or subsequent to the previous placement of a sibling, the agency is strongly encouraged to make reasonable efforts to place the siblings together, unless it would be contrary to the siblings' best interest or well-being. If siblings are not placed together, the agency should make reasonable efforts to ensure the siblings maintain frequent connections through visitation or other ongoing interaction, unless contrary to the siblings' placement or well-being.

The statutory language requires the agency to consider the "siblings' best interest" in placement of a child just as the juvenile court is required to do when determining legal custody.

{¶54} We find the preponderance of the evidence in the record supports the juvenile court's determination that it was in the best interest of A.J.K. to be placed in the legal custody of N.J.M. A.J.K.'s custodial history shows that since the child was five months old, A.J.K. has not known any stable parental figures other than N.J.M. and T.M. Adoptive Parents were available to care for A.J.K. after her birth, but Father evaded them and Oklahoma Children's Services and chose to bring A.J.K. to N.J.M. in Ohio. The only contact Adoptive Parents had with A.J.K. was through digital communication. At the time

of the legal custody hearing, A.J.K. was three years old. The delay in filing the legal custody proceedings was because of the complicated, bureaucratic process to get a birth certificate for A.J.K. from the State of Oklahoma, in part due to Father's evasions.

{¶55} The evidence provided by the CCJFS ongoing caseworker, GAL, N.J.M., and T.M. demonstrated that A.J.K. was fully integrated with the N.J.M. family. N.J.M. and T.M. were appropriate with the child and were providing her educational services, medical care, and financial assistance. The lead issue was discovered because N.J.M. took A.J.K. for a blood test to determine whether she was affected by Mother's drug usage. Upon the advice of A.J.K.'s medical providers, N.J.M. and T.M. then abated the presence of lead in their home by following the requirements of the contractors and the health department.

{¶56} At the time of the legal custody hearing, A.J.K.'s sibling was approximately eight years old. The testimony showed the sibling was aware of his sister but only knew that A.J.K. may come to live with him because Adoptive Parents communicated that message to him. Prior to the custody proceedings, N.J.M. and Adoptive Parents exchanged pictures and videos of the children. N.J.M. admitted that she had stopped contact with Adoptive Parents during the custody proceedings due to the stress of the proceedings and to avoid conflict amongst the adults. N.J.M. stated she still had the sibling's pictures and A.J.K. knew she had a brother. At the legal custody hearing, she testified she would facilitate the relationship between the siblings.

{¶57} We find the juvenile court considered the wishes of Father and Adoptive Parents (as exhibited by the Adoptive Parents' continued participation in the custody proceedings even after their motion to intervene and temporary custody motion had been denied). The preponderance of the evidence demonstrated the custodial history of A.J.K.,

her integration into the N.J.M. family, and the appropriateness of N.J.M.'s care for A.J.K. weighed more towards A.J.K.'s best interests than the limited sibling bond between A.J.K. and N.P. There was no abuse of discretion to determine it was in the best interest of A.J.K. to be placed in the legal custody of N.J.M.

{¶58} The first Assignment of Error is overruled.

## II. Motion to Intervene

{¶59} In his second Assignment of Error, Father contends the juvenile court erred when it denied Adoptive Parents' motion to intervene, as sponsored by Father.

{¶60} In their October 1, 2020 motion to intervene, Adoptive Parents argued they should be permitted to intervene in the custody proceedings pursuant to Civ.R. 24. They did not specify in their motion whether they sought intervention pursuant to Civ.R. 24(A) or Civ.R. 24(B). In Father's appellant's brief, he does not specify under which section the Adoptive Parents sought to intervene.

{¶61} To the extent Adoptive Parents' motion was based upon subsection (A), this Court's standard of review is de novo. *In re K.K.E.*, 5th Dist. Tuscarawas No. 2020 AP 08 0016, 2020-Ohio-6723, 2020 WL 7385292, ¶ 11. Under Civil Rule 24(A), a party may intervene as of right, "(1) when a statute of this state confers an unconditional right to intervene; or (2) when the applicant claims an interest relating to the property or transaction that is the subject of the action * * *." Civil Rule 24(A)(2) permits intervention as of right only when an applicant has a legal interest in the action. *Id.* citing *Rumpke v. Sanitary Landfill, Inc. v. State*, 128 Ohio St.3d 41, 2010-Ohio-6037, 941 N.E.2d 1161.

{¶62} The Ohio Supreme Court has set forth criteria for third parties to be considered parties for purposes of intervention in abuse, neglect, and dependency cases

pursuant to Civil Rule 24(A). *In re K.K.E., supra* at ¶ 12 citing *In re Schmidt*, 25 Ohio St.3d 331, 496 N.E.2d 952 (1986). *In re Schmidt* focuses on whether the grandparents obtained, through statute, court order, or other means, any legal right to custody and whether they had any legal interest in the care and custody of the children. *Id.* Desire for custody or concern for the child's welfare, "cannot be construed as a legal interest that falls within the scope of 24(A)." *Id.*

{¶63} Like in *Schmidt*, there are no allegations or evidence set forth in Adoptive Parents' motion to intervene that would reasonably indicate Adoptive Parents had a "right" to custody or visitation with A.J.K. other than they were the adoptive parents of A.J.K.'s sibling; rather, they had a desire for custody. Accordingly, we review the motion to intervene pursuant to Civil Rule 24(B). *In re K.K.E., supra* at ¶ 13.

{¶64} Civ.R. 24(B) allows for permissive intervention: "(1) when a statute of this state confers a conditional right to intervene; or (2) when an applicant's claim or defense and the main action have a question of law or fact in common." In exercising its discretion under Civil Rule 24(B), the juvenile court "shall consider whether the intervention will unduly delay or prejudice the adjudication of the rights of the original parties." *In re K.K.E., supra* at ¶ 14 citing Civ.R. 24(B).

{¶65} In reviewing the juvenile court's denial of a motion to intervene pursuant to Civil Rule 24(B), the proper standard of review is whether the trial court's action constituted an abuse of discretion. *Id.* at ¶ 15 citing *State ex rel. Merrill v. Ohio Dept. of Natural Resources*, 130 Ohio St.3d 30, 2011-Ohio-4612, 955 N.E.2d 935. In order to find an abuse of discretion, we must determine the trial court's decision was unreasonable,

arbitrary, or unconscionable, and not merely an error of law or judgment. *Blakemore v. Blakemore*, 5 Ohio St.3d 217, 450 N.E.2d 1140 (1983).

{¶66} Juv.R. 2(Y) and Civ.R. 24(B) give the juvenile court wide discretion to determine the parties to the juvenile action by permitting or denying intervention. *In re T.H.*, 5th Dist. Muskingum No. CT2016-0008, 2016-Ohio-7310, 2016 WL 5940833, ¶ 28. Under Juv.R. 2(Y), a party is defined as, "a child who is the subject of a juvenile court proceeding, the child's spouse, if any, the child's parent or parents, or if the parent of a child is a child, the parent of that parent, in appropriate cases, the child's custodian, guardian, or guardian ad litem, the state, and any other person specifically designated by the court."

{¶67} The Eighth District Court of Appeals stated in *In re R.W.*:

The rule "affords a procedural device permitting a trial court to include individuals not specifically otherwise designated a party but whose presence is necessary to fully litigate an issue presented in the action." *In re Franklin*, 88 Ohio App.3d 277, 280, 623 N.E.2d 720 (3d Dist.1993). Thus, "the court may protect and adjudicate all legitimate claims, protect all interests appearing, avoid multiple litigation and conserve judicial time in the orderly administration of justice." *Id.*

*In re T.H.*, 5th Dist. Muskingum No. CT2016-0008, 2016-Ohio-7310, 2016 WL 5940833, ¶ 28 quoting *In re R.W.*, 2015–Ohio–1031, 30 N.E.3d 254, ¶ 16 (8th Dist.).

{¶68} This Court has previously examined whether a trial court abused its discretion in a decision on a motion to intervene pursuant to subsection (B) and considered whether the person attempting to intervene in some manner filled the role of

the parents. *In re T.H.*, 5th Dist. Muskingum No. CT2016-0008, 2016-Ohio-7310. The Ohio Supreme Court explained the term "in loco parentis" means "charged, factitiously, with a parent's rights, duties, and responsibilities." *State v. Noggle*, 67 Ohio St.3d 331, 1993-Ohio-189, 615 N.E.2d 1040, citing Black's Law Dictionary (6th Ed. 1990) 787. A person in loco parentis has assumed the same duties as a guardian or custodian, only not through a legal proceeding. *Id.*

{¶69} This Court found the juvenile court did not abuse its discretion in allowing the foster parents to intervene in a case where they assumed the dominant parental role for the child for over two years. *In re K.K.E.*, 5th Dist. Tuscarawas No. 2020 AP 08 0016, 2020-Ohio-6723, 2020 WL 7385292, ¶ 18 citing *In re T.H.*, 5th Dist. Muskingum No. CT2016-0008, 2016-Ohio-7310. In this case, there is no evidence that Adoptive Parents assumed the dominant parental role for A.J.K., that they exercised significant parental control over A.J.K., or that A.J.K. relied on Adoptive Parents for support. Adoptive Parents argue they have been involved with A.J.K. since her birth. Their involvement, however, has been limited to communication with Father, Oklahoma Children's Services, Father's mother, and N.J.M. As stated above, Father chose to bring A.J.K. to N.J.M. in Ohio, not to Adoptive Parents. Thus, Adoptive Parents, due to Father's choices, have not been in loco parentis with A.J.K.

{¶70} In order to decide a motion to intervene in a juvenile proceeding, the trial court must look to whether intervention is in the best interests of the child. *In re R.W.*, 2015–Ohio–1031, ¶ 16 citing *In re B.O.*, 11th Dist. Lake No.2011–L–055, 2011–Ohio–6210, ¶ 40–41. While the juvenile court denied the Adoptive Parents' motion to intervene, the juvenile court permitted Adoptive Parents to participate in all aspects of the custody

proceedings.[1] The record is replete with evidence supporting the Adoptive Parents' position as to custody. The juvenile court considered the Adoptive Parents in determining the best interests of A.J.K. and found it was in the child's best interests to be placed in the legal custody of N.J.M.

{¶71} We find no abuse of discretion for the juvenile court to deny the Adoptive Parents' motion to intervene.

{¶72} Father's second Assignment of Error is overruled.

### CONCLUSION

{¶73} The judgment of the Coshocton County Court of Common Pleas, Juvenile Division, is affirmed.

By: Delaney, J.,

Wise, Earle, P.J. and

Gwin, J., concur.

---

[1] Adoptive Parents filed a motion for a third-party complaint on March 24, 2021, which Father alleges the juvenile court failed to rule on before granting legal custody to N.J.M. We have held that a trial court's failure to rule on a motion is normally deemed to be a denial of that motion for purposes of appellate review. *Hollenbaugh v. Hollenbaugh*, 5th Dist. Delaware No. 13CAF070056, 2014-Ohio-1124, ¶ 36 citing *Capital One Bank (USA), N.A. v. Rodgers*, 5th Dist. Muskingum No. CT2009-0049, 2010-Ohio-4421, ¶ 13.